IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARK ANTHONY LEWIS,        : | |
|     Plaintiff.         : | |
|                 : | CIVIL ACTION |
|     v.             : | |
|                 : | NO. 02-1016 |
| BELL ATLANTIC/VERIZON, et al.,   : | |
|     Defendants.        : | |

**MEMORANDUM**

Presently before the Court is Defendant's Motion For Summary Judgment, (Doc. No. 82). For the following reasons, we entered the Order dated July 31, 2008, granting Defendant's Motion.[1]

**I.    BACKGROUND**[2]

---

[1] Plaintiff also filed a Request for Summary Judgment, (Doc. No. 91), as well as an Addendum to Plaintiffs' Request for Summary Judgment, (Doc. No. 90), and an Opposition to Defendants' Request for Summary Judgment, (Doc. No. 98). Defendants are correct that these filings were not timely under the scheduling order entered on February 23, 2007. (Doc. No. 92 at 2.) We also note that these filings appear to simply respond to answering Defendant's Motion for Summary Judgment. In the interest of fairness, given Plaintiff's *pro se* status, we will treat Plaintiff's filings as timely responses to Defendant's motion for summary judgment.

[2] Plaintiff has been prolific in his filings. There are many, they are rambling, and they are difficult to comprehend. They contain numerous allegations and accusations that are not supported in the evidentiary record. Under Rule 56 of the Federal Rules of Civil Procedure, we are required to consider "such facts as would be admissible in evidence" at trial. "Rule 56(e) does not allow a party resisting the motion to rely merely on bare assertions, conclusory allegations or suspicions." *Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982). We have not included the unsupported allegations in the statement of facts.

Defendant Idearc Media Services ("Idearc"), formerly known as Bell Atlantic Directory Graphics, Inc., ("Bell Atlantic" or "the Company"), is a communication and information services company.[3]  (Doc. No. 84 ¶ 1.)  On September 3, 1997, Plaintiff Mark Anthony Lewis, an African-American male, applied for employment with Defendant, then doing business as Bell Atlantic Directory Graphics.  (Doc. No. 85, Ex. B, Ex. 9, Ex. 6 ("Application for Employment").)  On September 17, 1997, Bell Atlantic hired Plaintiff to work as an advertisement compositor in the production department of its Valley Forge, Pennsylvania office.  (*Id*. ¶¶ 3-4.)  In its offer letter to Plaintiff, Defendant informed Plaintiff that his continued employment with the Company was contingent on a successful background check that could include education verification, prior employment verification, motor vehicle record checks, and substance screening.  (Doc. No. 85 Ex. 7.)  Defendant went on to state that its verification process was ongoing and might take place after his employment began.  (*Id*.)  Defendant reserved the right to terminate Plaintiff's employment at any time based on the results of their background check.  (*Id*.)

Prior to joining Bell Atlantic, Plaintiff worked as a copy consultant and then as a desktop publishing consultant at Kinko's from 1994 to 1996.  (*Id*. ¶ 14.)  Plaintiff failed to list his employment with Kinko's on his application with Bell Atlantic.  Plaintiff was terminated by Kinko's in February of 1996 after he was involved in a physical confrontation with a customer.

---

[3] Initially there were numerous Defendants in this action.  The only remaining Defendants are Idearc and CORE.  Defendant CORE has not been actively involved in this litigation.  For purposes of this opinion, "Defendant" refers to Idearc, unless otherwise specified.

(Doc. No. 84 ¶ 14.)[4]

On October 9, 1998, Plaintiff's direct supervisor, Mark Monzo, discovered that Plaintiff had been using Defendant's computers for personal use in violation of company policy. (Doc. No. 85, Ex. B, Ex. 4.) A follow-up investigation revealed that Plaintiff had falsified his time sheets for October 8, 1998, by reporting his personal computer use as billable work time. (*Id*.) On October 14, 1998, Defendant suspended Plaintiff for five days without pay for this incident. (*Id*.) This suspension was later withdrawn, Plaintiff was reinstated with full pay, and the incident was expunged from Plaintiff's record. (Doc. No. 84 ¶ 5; Doc. No. 85, Ex. B, Ex. 9 at 7.)

On January 12, 1999, Plaintiff was given a performance rating of "IN-Improvement Needed to Meet Position Requirements," in his year-end performance appraisal and was rated "Deficient" in the areas of "Efficiency" and "Accuracy." (Doc. No. 85, Ex. B, Ex. 9, Ex. 3.)

On February 10, 1999, Plaintiff was involved in a heated altercation with a fellow compositor, Ken Rice. (Doc. No. 84 ¶ 6.) According to witnesses, Rice approached Plaintiff to discuss a rumor about departmental pay raises. (Doc. No. 85, Ex. B, Ex. 9, Ex. 4.) When Rice asked Plaintiff if he was responsible for starting the rumor, Plaintiff became agitated and the two became engaged in a heated argument in front of their colleagues. (*Id*.) Trish Kahle, a fellow employee, asked Plaintiff to move the argument into a conference room. Plaintiff refused and the argument escalated. (*Id*.) Two other female co-workers then pushed the two men into a

---

[4] As a result of that termination, Plaintiff filed a lawsuit against Kinko's alleging race discrimination in violation of Title VII of the Civil Rights Act and the Pennsylvania Human Relations Act ("PHRA"). *Lewis v. Kinko's of Ohio*, Civ. A. No. 99-3028, 2004 WL 764382, at *2-4 (E.D. Pa. Mar. 31, 2004). By Memorandum and Order dated March 31, 2004, Kinko's Motion For Summary Judgment was granted and judgment was entered in favor of Defendant and against Plaintiff. (Doc. No. 38). Plaintiff filed an appeal in the Third Circuit Court of Appeals. On November 23, 2005, the Third Circuit affirmed the District Court.

foyer where they continued their argument. (*Id*.) Karl Papousek, a fellow employee, finally intervened and later notified David Paczkowski, the department supervisor, of the incident. (*Id*.) Both men were sent home for the day pending an investigation. (Doc. No. 84 ¶ 6.)

The follow-up investigation by Defendant revealed that Plaintiff was the aggressor in the incident, and that his altercation with Rice was not his first violent outburst in front of his colleagues. (*Id*.) Several of Plaintiff's co-workers expressed concern to their supervisor advising that they felt unsafe around Plaintiff. (Doc. No. 85, Ex. B, Ex. 9, Ex. 4.) The investigation further revealed that Plaintiff had provided false information on his employment application. On the employment application, Plaintiff indicated that he had graduated from high school. In fact, Plaintiff had not graduated from high school. Plaintiff was expelled in his senior year of high school for hacking into the school computer system and changing information. (Doc. No. 85 ¶ 6; Doc. No. 85, Ex. B, Ex. 9 at 3.)

On February 12, 1999, based upon these findings, Defendant suspended Plaintiff indefinitely with intent to terminate. (Doc. No. 84 ¶¶ 6-7.) However, Plaintiff's Union intervened on his behalf and negotiated a "last chance agreement" that allowed Plaintiff to return to work. (Doc. No. 84 ¶ 7.) This agreement required Plaintiff to undergo a psychological evaluation as a precondition of his returning to work. (Doc. No. 85, Ex. B, Ex. 9, Ex. 2.) The Agreement also placed Plaintiff on a performance improvement plan that required him to attain acceptable performance levels within 90 days of his return to work and required him to conduct himself in accordance with the Bell Atlantic Code of Business Conduct. (*Id*.)

When Plaintiff returned to work in March, 1999, he filed a written complaint with Defendant, alleging that his suspensions in 1998 and 1999 were the result of disparate treatment

based on his race. (Doc. No. 85, Ex. B, Ex. 9, Ex. 1.) Defendant responded by hiring S.J. Bashen Corporation ("Bashen"), a human resources consulting firm, to investigate Plaintiff's claim. (Doc. No. 85, Ex. B, Ex. 9.) On July 7, 1999, after conducting interviews with both Plaintiff and other company employees and performing a comparative analysis of past disciplinary cases, Bashen issued a written summary of its findings. (*Id*.) Bashen found that there was no evidence that Plaintiff's suspensions resulted from any form of racial discrimination or disparate treatment and that Plaintiff's claims were "unsubstantiated." (*Id*.) Specifically, Bashen's comparative analysis indicated that between 1997 and 1998, Defendant terminated four white employees for lying on their employment applications, while Plaintiff was actually permitted to keep his job. (*Id*.) Moreover, Bashen found that of the department's thirty-one compositors, approximately thirty-percent were African-American, while roughly sixty-percent were white. (*Id*.) In 1999, African-American compositors received 33% of all disciplinary actions, while white compositors received 66% of the department's disciplinary actions. (*Id*.) Of the three employees disciplined in Mark Monzo's group, two were white. (*Id*.) On July 19, 1999, Defendant informed Plaintiff of Bashen's findings. (Doc. No. 84 ¶ 9.)

On February 22, 2000 Plaintiff contacted CORE, Defendant Idearc's short-term disability provider, and informed them that he had been unable to work from January 24, 2000 to February 4, 2000. (Doc. No. 84 ¶ 10.) Several days later, Plaintiff sent forms to CORE purporting to verify his disability during that period of time. (*Id*.) On March 2, 2000, CORE approved Plaintiff's request for short-term disability benefits for the time period between January 24, 2000 and February 4, 2000. (*Id*.) Plaintiff received short-term disability benefits for this time period. Plaintiff was also being paid by his employer for working during that time period. (*Id*.; Doc. No.

85, Ex. A at 126-127.)

On March 14, 2000, Plaintiff reported to work and requested immediate leave under the Family Medical Leave Act. (Doc. No. 84 ¶ 11; Doc. No. 91, Ex. 3.) Plaintiff then left work after only half an hour of his scheduled work shift. (*Id*.; Doc. No. 85, Ex. C.) Plaintiff subsequently submitted a time sheet indicating that he had worked for 7.5 hours on that day. (*Id*.) Plaintiff's Manager, Abby Eltz, reviewed Plaintiff's time sheet and corrected it to reflect the time he actually worked. (Doc. No. 85, Ex. C.) On March 23, 2000, Plaintiff was suspended pending an investigation of his time sheets. (Doc. No. 85, Ex. E.) On March 27, 2000, at the conclusion of this investigation, Defendant terminated Plaintiff, citing his violation of the Code of Business Conduct. (*Id*.; Doc. No, 84 ¶ 12.)

Following his termination, Plaintiff filed a grievance with his Union, the Communications Workers of America, arguing that his termination was not for just cause. (Doc. No. 85 ¶ 13; Doc. No. 91, Ex. 13.) The grievance was arbitrated by a three-person Board of Arbitration between July 31, 2001 and December 7, 2001. (Doc. No. 85, Ex. B, Ex 10.) After taking testimony from Plaintiff and others, the Board of Arbitration entered an award in favor of Defendant. The Board denied Plaintiff's grievance and found that Defendant had just cause to terminate Plaintiff.[5] (*Id*.)

On February 27, 2002, Plaintiff filed the instant lawsuit against Defendant, now doing business as Idearc Media Services-East, Inc ("Idearc"), CORE, and various Bell Verizon

---

[5] At his deposition, Plaintiff admitted that after the Arbitration he attempted to have the union attorney who represented him at the arbitration and the Chairman of the Board of Arbitration arrested. (Doc. No. 85, Ex. A at 102-108.) In July of 2007, Plaintiff also filed a document entitled Complaint and Affidavit for the Arrest of Arthur Telegan, (Doc. No. 94). Arthur Telegan is counsel for Defendants in this case.

employees claiming race discrimination in violation Title VII of the Civil Rights Act, and the Pennsylvania Human Relations Act.[6]  (Doc. No. 1.)  On December 20, 2002, we granted the individual Defendants' Motion to Dismiss for Insufficiency of Process under Federal Rule of Civil Procedure 4(m).  (Doc. No. 23.)[7]

**II      LEGAL STANDARD**

In considering a motion for summary judgment, the court must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Fed. Home Loan Mortgage Corp. v. Scottsdale Ins. Comp.*, 316 F.3d 431, 443 (3d Cir. 2003).  Only facts that may affect the outcome of a case are "material."  Moreover, all reasonable inferences from the record are drawn in favor of the non-movant.  *Anderson*, 477 U.S. at 255.  Although the movant has the initial burden of demonstrating the absence of genuine issues of material fact, the non-movant  must then establish the existence of each element on which it bears the burden of proof.  *See Watson v.*

---

[6] There is no statement in Plaintiff's Complaint or Amendment to Original Complaint indicating that this action is brought pursuant to 42 U.S.C. § 1981. In subsequent filings, Plaintiff has suggested that he is pursuing claims under Section 1981.  (*See* Doc. No. 99 at 5.)  Moreover, Defendant has framed its Motion for Summary Judgment on the assumption that Plaintiff is proceeding, *inter alia*, under Section 1981.  In the interest of thoroughness, and in consideration of Plaintiff's *pro se* status, we will proceed under the same assumption.

[7] In the caption of his Complaint Plaintiff named nineteen individuals as Defendants in addition to Bell Atlantic/Verizon and CORE.  Plaintiff never properly served the individual Defendants.

*Eastman Kodak Company*, 235 F.3d 851, 857-58 (3d Cir. 2000).  Plaintiffs cannot avert summary judgment with speculation or by resting on the allegations in their pleadings, but rather must present competent evidence from which a jury could reasonably find in their favor. *Ridgewood B. of Educ. v. N.E. for M.E.*, 172 F.3d 238, 252 (3d Cir. 1999); *Woods v. Bentsen*, 889 F. Supp. 179, 184 (E.D. Pa. 1995).  When the outcome of a case will depend upon credibility determinations or state of mind, summary judgment is inappropriate. *Coolspring Stone Supply, Inc. v. Am. States Life Ins. Co.*, 10 F.3d 144, 148 (3d Cir. 1993).

**III      LEGAL ANALYSIS**

Plaintiff's claims in this matter appear to consist of three discrete allegations of racially motivated employment discrimination in violation of the PHRA, Title VII of the Civil Rights Act of 1964, and 42 U.S.C. § 1981.  Employment discrimination claims are analyzed under a burden-shifting framework applicable to all three statutes.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 803 (1973); *Jones v. School Dist. of Philadelphia*, 198 F.3d 403, 410-15 (3d Cir. 1999); *Fekade v. Lincoln Univ.,* 167 F. Supp. 2d 731, 740 (E.D. Pa. 2001) (applying *McDonnell Douglas* burden-shifting framework to discrimination claim under the PHRA).  Under the *McDonnell Douglas* test, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination or unlawful retaliation. *McDonnell Douglas*, 411 U.S. at 802.  Once a *prima facie* case is established, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997).  If the employer articulates a non-discriminatory reason for the action, the plaintiff must then establish by a preponderance of the evidence that the defendant's

8

articulated reason is merely a pretext for discrimination. *Id*. at 501. As the Third Circuit has explained:

> the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the plaintiff must demonstrate such weakness, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them "unworthy of credence," and hence infer "that the employer did not act for [the asserted] nondiscriminatory reasons."

*Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994). In the absence of direct evidence of discrimination, a plaintiff may rely on circumstantial evidence to demonstrate weaknesses, inconsistencies, implausibilities, or contradictions in the employer's explanation for its action "so as to permit a reasonable factfinder to infer that the employer did not act for the proffered reasons." *Shaner v. Synthes*, 204 F.3d 494, 503 (3d Cir. 2000) (citing *Fuentes*, 32 F.3d at 764-65). To survive summary judgment, a plaintiff "must present sufficient evidence to raise a genuine issue of fact as to whether the defendant's proffered reasons were not its true reasons for the challenged employment action." *Stewart v. Rutgers*, 120 F.3d 426, 433 (3d Cir. 1997).

To establish a *prima facie* case, a plaintiff must show that (1) he is in a protected class, (2) is qualified for the position, (3) suffered an adverse employment action, (4) under circumstances that give rise to an inference of unlawful discrimination. *See Jones*, 198 F.3d at 410-12. There is no prescribed formula necessary to demonstrate a *prima facie* case, and the specific manner of doing so will vary from one case to another. *See Matczak v. Frankford Candy & Chocolate Co.*, 136 F.3d 933, 938 (3d Cir. 1997). The *prima facie* case requires "only

'evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion.'" *See Pivirotto v. Innovative Sys.*, 191 F.3d 344, 356 (3d Cir. 1999) (quoting *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312 (1996)). A *prima facie* case must be established by a preponderance of the evidence. *See Bullock v. Children's Hosp.*, 71 F. Supp. 2d 482, 490 (E.D. Pa. 1999). Demonstrating only a mere possibility of discrimination will not suffice. *See id*.

A review of the record in this case reveals that Plaintiff has failed to establish a *prima facie* case that any of the three incidents alleged in his complaint were racially motivated employment discrimination.

Initially we note that Plaintiff's 1998 suspension for misuse of company time was not an adverse employment action. Defendant has produced undisputed evidence that this suspension was later withdrawn. Plaintiff was reinstated with full pay. The Supreme Court has held that "[a] tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, a decision causing significant change in benefits." *Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998). It is possible for a suspension that is later followed by reinstatement with pay to nonetheless amount to an adverse employment decision under Title VII, the PHRA and Section 1981. For this to occur, however, the suspension must result in the loss of some sort of tangible benefits. *See Wright v. Pepsi Cola Co.*, 243 F. Supp. 2d 117, 121-22 (D. Del. 2003). *See also, Sarko v. Henderson*, Civ. A. No. 03-3473, 2004 U.S. Dist. Lexis 22194, at * 7-8 (E.D. Pa. 2004) Plaintiff has offered no evidence to suggest that he was denied any tangible benefits or employment opportunities as a result of his 1998 suspension. There was no adverse employment

action. Therefore, Plaintiff cannot establish a *prima facie* case of employment discrimination based upon that suspension.

Similarly, Plaintiff has not made out a *prima facie* case that his 1999 suspension occurred under circumstances that would give rise to an inference of unlawful racial discrimination. Plaintiff admits that his suspension was instituted following his involvement in an altercation with a co-worker. (Doc. No. 85, Ex. A at 36, 57-58.) However, again, Plaintiff has offered no evidence suggesting that he was terminated based on unlawful racial motivations. On the contrary, Plaintiff admits that Defendant disciplined the co-worker with whom he had the altercation, and treated both Plaintiff and the co-worker identically until its investigation was completed, whereupon Plaintiff was determined to have been the instigator of the incident. (*Id*. at 166.) Moreover, Plaintiff has failed to produce any evidence suggesting that his suspension for supplying false information on his employment application was racially motivated. Rather, Defendant has submitted evidence indicating that in the two years preceding Plaintiff's 1999 suspension, four Caucasian employees were terminated for providing false pre-employment information. (Doc. No. 85, Ex. B, Ex. 9 at 5.) It seems clear that Defendant would have been perfectly justified in terminating Plaintiff for lying on his employment application and for fighting with a co-worker. However, Plaintiff's union intervened and negotiated an agreement with Defendant that permitted Plaintiff to continue his employment. Based upon the evidence before us, there is no genuine issue of material fact regarding Defendant's motive in suspending Plaintiff in 1999. That suspension was clearly based upon legitimate, non-discriminatory reasons. There is no evidence to suggest that it was based upon race.

Finally, Plaintiff has failed to establish a *prima facie* case that his termination in 2000

was racially motivated.  In the context of discriminatory termination claims, the Third Circuit has restated the *McDonell-Douglas* test as requiring a plaintiff to establish that "(1) he belongs to a racial minority; (2) he was qualified for the position; (3) he was discharged; and (4) other employees not in a protected class were treated more favorably."  *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 638 (3d Cir. 1993); *Jackson v. Univ. of Pittsburgh*, 826 F.2d 230, 233 (3d Cir. 1987), *cert. denied*, 484 U.S. 1020 (1988).  Plaintiff has offered no evidence suggesting that Defendant failed to terminate other employees not in a protected class based upon time sheet violations and improper receipt of disability benefits.  Rather, at his deposition Plaintiff testified that whether or not someone was given favored treatment with regard to time sheet violations was not based upon race, but rather upon an individual employee's relationship with management.  (Doc. No. 85, Ex. A at 173-74.)   Moreover, Plaintiff has failed to offer any evidence suggesting that Defendant's treatment of time sheet violators was disparate between members of different racial groups.

Even if Plaintiff were able to establish a *prima facie* case, Defendant presents overwhelming evidence that Plaintiff was terminated for legitimate, non-discriminatory reasons.  Specifically, Defendant has submitted evidence demonstrating that Plaintiff was terminated in February, 2000 for submitting time sheets claiming to have worked hours that he demonstrably did not work and for fraudulently receiving disability benefits and wages at the same time.  (Doc. No. 85, Ex. G.)  Plaintiff's conduct violated Defendant's Code of Business Conduct.  The violations constituted legitimate, non-discriminatory reasons for Plaintiff's termination.  The Board of Arbitrators reached this same conclusion.

Finally, Plaintiff has failed to demonstrate inconsistencies, contradictions or

implausibilities in Defendant's reasons for termination from which a fact finder could infer that they were pretextual.

      For these reasons, Defendant's Motion For Summary Judgment was granted.

                                      BY THE COURT:

                                      _____
                                      R. Barclay Surrick, J.